**Affirmed and Opinion Filed July 19, 2022**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-22-00147-CV

### IN THE INTEREST OF D.P., A CHILD

**On Appeal from the 256th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-17-14694**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Osborne

The father of D.P., a child, appeals the trial court's January 20, 2022 "Order in Suit Affecting the Parent-Child Relationship." The order appoints the Texas Department of Family and Protective Services (the "Department") as managing conservator of D.P., and D.P.'s Father and Mother as possessory conservators. In one issue, Father contends the trial court abused its discretion in rendering the order. We conclude the trial court's decision was not arbitrary or unreasonable and is supported by the evidence. Accordingly, we affirm the trial court's order.

### BACKGROUND

D.P. was born in 2014. In 2018, the trial court signed an order appointing Father as D.P.'s managing conservator and Mother as possessory conservator.

Mother was ordered to pay child support and to have "visits as agreed and supervised by paternal grandmother until further order of the court."

In 2020, the Department filed a motion to modify. The motion was based on Father's report to the Department that Mother had taken D.P. without Father's permission and did not respond to Father's attempts to contact her. The Department's written report reflected that Father was concerned about D.P.'s welfare because Mother "is using drugs and is a prostitute and a victim of human trafficking due to the prostitution." A law enforcement officer located Mother several days later, and Mother agreed to bring D.P. to the office. Mother reported that Father uses crystal meth, is sometimes homeless, and once tried to choke her. Mother and Father denied each other's allegations.

The Department's investigation resulted in additional concerns, including Father's positive drug test and Mother's possible involvement in prostitution. The Department reported that D.P. had been living with her paternal grandmother ("Grandmother"), but after a home assessment, placement with Grandmother was denied "due to safety concerns." The Department requested it be named D.P.'s temporary managing conservator with the right to place D.P. in foster care. The trial court signed temporary orders appointing the Department as temporary managing conservator. The record reflects, however, that despite the home assessment, D.P. remained with Grandmother, where she had been living when not with one of her parents.

In November 2020, Grandmother's hair strand drug test was positive for cocaine. D.P. and her brother were removed from the home, and D.P. was placed in foster care. Grandmother adamantly denied drug use and underwent an independent drug test that was negative. Subsequent tests, however, remained positive. Both Mother and Father also tested positive for drugs in the months prior to trial.

D.P. struggled in foster care. In June 2021, D.P. was placed with her maternal great aunt ("Aunt"). Later that month, the court ordered that "Grandmother's access to the child is suspended." In August 2021, Grandmother intervened in the suit, requesting that she be granted sole managing conservatorship and possession of D.P.

The case proceeded to trial on December 10, 2021. In addition to Mother, Father, Grandmother, and Aunt, the trial court heard testimony from: (1) Carla Brown, D.P.'s caseworker, (2) Marilyn Jackson, a counselor, (3) Jerriann Conaty, D.P.'s CASA advocate; and (4) Linda Harris, a medical technologist. D.P.'s attorney ad litem and guardian ad litem ("AAL/GAL") Nicolette Laroe also provided a statement to the court. Because neither parent was seeking managing conservatorship of D.P., and because the Department was, by the time of trial, not seeking to terminate either Mother or Father's parental rights, the testimony focused on whether it was in D.P.'s best interest to place D.P. with Grandmother or for D.P. to remain with Aunt.

The trial court concluded that it was in D.P.'s best interest to remain with Aunt,[1] appoint the Department as managing conservator, appoint Mother and Father as possessory conservators, and deny Grandmother any conservatorship, possession, or access. The trial court rendered judgment accordingly. Father now appeals.[2]

## ISSUE AND STANDARD OF REVIEW

In his sole issue, Father contends the trial court abused its discretion by naming the Department as D.P.'s managing conservator, determining that placement with Grandmother would not be in D.P.'s best interest, and in denying Grandmother "a conservatorship title as well as access and possession" of D.P.

Unlike the clear and convincing standard applicable in a termination proceeding, the appointment of a non-parent as managing conservator need only be proven by a preponderance of the evidence. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In Interest of J.M.I.*, No. 01-16-00829-CV, 2017 WL 1175568, at *6 (Tex. App.—Houston [1st Dist.] Mar. 30, 2017, no pet.) (mem. op.). Accordingly, we review a trial court's orders regarding conservatorship of a child for abuse of discretion. *Interest of J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021). "The best interest

---

[1] The trial court found that Aunt agreed to participate in the "Fostering Connections Program," and the Department agreed "to facilitate such participation." The court ruled that if Aunt is licensed as a foster parent after completion of the required classes, then D.P. will remain with Aunt for six months after completion of the program. After the six month period has elapsed, the Department "shall transfer managing conservatorship" to Aunt.

[2] Grandmother filed a timely notice of appeal and requested additional time to file her brief. We granted the requested extension, but no brief was filed. We granted Grandmother an additional ten days to file an extension motion and brief, but cautioned her that her appeal would be dismissed if the brief and extension motion were not filed within the time specified. When Grandmother did not respond, we dismissed her appeal. Accordingly, Father is now the sole appellant in this appeal.

of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE § 153.002. "A trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function." *Interest of J.J.R.S.*, 627 S.W.3d at 218.

The court in *Interest of J.J.R.S.* explained that "conservatorship determinations are 'intensely fact driven.'" *Id.* (quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002)). "[T]he trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record.'" *Id.* (quoting *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)). The trial court's judgment will be reversed only when it appears from the record as a whole that the court has abused its discretion. *Id.* "A trial court abuses its discretion when it acts 'without reference to any guiding rules or principles; or in other words, [when it acts] arbitrarily or unreasonably.'" *Id.* (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)).

In family law cases, the abuse of discretion standard of review overlaps with the traditional sufficiency standards of review; as a result, legal and factual sufficiency are not independent grounds of reversible error, but instead constitute

factors relevant to our assessment of whether the trial court abused its discretion. *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied).[3]

To determine whether the trial court abused its discretion we consider whether the trial court (i) had sufficient evidence on which to exercise its discretion and (ii) erred in its exercise of that discretion. *In re A.B.P.*, 291 S.W.3d 91, 95 (Tex. App.—Dallas 2009, no pet.). The applicable sufficiency review comes into play with the first question. *Moroch*, 174 S.W.3d at 857. We then determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.* An abuse of discretion generally does not occur if some evidence of a substantive and probative character exists to support the trial court's decision. *In re S.M.V.*, 287 S.W.3d 435, 450 (Tex. App.—Dallas 2009, no pet.). Further, because the trial court has "full opportunity to observe witness testimony first-hand," it is "the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

### DISCUSSION

### 1. Appointment of managing conservator

Section 153.131 of the family code provides that "a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing

---

[3] The Department argues that the factual sufficiency of the evidence is not "a valid consideration" in determining whether the trial court abused its discretion. The Department does not explain how, or if, this distinction would affect our review in this case. Consequently, without further discussion we follow this Court's long adherence to the standards as stated in *Moroch*.

conservators of the child" "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." TEX. FAM. CODE § 153.131(a). "It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child." TEX. FAM. CODE § 153.131(b).[4] Here, however, neither parent challenges the court's ruling appointing them possessory conservators.[5] Instead, Father challenges the court's ruling regarding Grandmother.

Because neither parent sought managing conservatorship, the trial court was required to decide whether to appoint Grandmother or the Department as managing conservator. *See* TEX. FAM. CODE ANN. § 153.005 (appointment of sole or joint managing conservator). There is no statutory presumption that a grandparent should be preferred over other non-parents. *In Interest of J.M.I.*, 2017 WL 1175568, at *6 (quotation omitted).

Father argues that "[t]he evidence is legally and factually insufficient to support CPS as the managing conservator of the child." As we have explained,

---

[4] Both subsections include an exception where there is a finding of a history of family violence. TEX. FAM. CODE ANN. § 153.131(a), (b).

[5] As the Department explains, the only evidence at trial regarding Mother and Father supported the trial court's finding that "appointment of a parent as managing conservator of the child would significantly impair the child's physical or emotional well-being." During the pendency of the suit, Mother failed to pass any drug tests, did not complete any services, missed visits with D.P. without explanation, and did not participate in court hearings. Father's drug tests were positive for cocaine and marijuana, and he was unable to obtain housing by the time of trial. None of this evidence was challenged at trial or on appeal.

D.P.'s best interest was the trial court's "primary consideration" in determining whether to appoint the Department as managing conservator. TEX. FAM. CODE § 153.002. Courts may use the nonexhaustive list of "*Holley* factors" to determine the child's best interest. *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re Doe 2,* 19 S.W.3d 278, 300 n. 20 (Tex. 2000) (recognizing that intermediate courts employ the *Holley* factors to ascertain best interest in conservatorship cases).

Those factors include, but are not limited to:

(A)  the desires of the child;

(B)  the emotional and physical needs of the child now and in the future;

(C)  the emotional and physical danger to the child now and in the future;

(D)  the parental abilities of the individuals seeking custody;

(E)  the programs available to assist these individuals to promote the best interest of the child;

(F)  the plans for the child by these individuals or by the agency seeking custody;

(G)  the stability of the home or proposed placement;

(H)  the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)  any excuse for the acts or omissions of the parent.

*Holley,* 544 S.W.2d at 371–72. These factors are not exhaustive and not all will apply in every case. *See Interest of L.J.H.*, No. 05-21-00183-CV, 2021 WL 4260769, at *14 (Tex. App.—Dallas Sept. 20, 2021, no pet.) (mem.op.).

## 2. D.P.'s best interest

Our analysis of the record is guided by the *Holley* factors, and we will address the evidence in the light of those factors. But as we discuss, much of the evidence at trial focused on D.P.'s emotional needs and emotional danger to D.P. Consequently, our analysis combines certain factors and omits others on which little or no evidence was offered. *See id.*

### A. D.P.'s desires

D.P. did not testify at trial.

Father explained, "I want my daughter to go where she wants to be at, and she told me that she wanted to be back at home with her grandmother." Father testified that D.P. misses Grandmother, and that D.P. wondered why she could not visit Grandmother for her birthday. Grandmother testified that she saw D.P. briefly the week before trial when visiting another child. Grandmother explained that D.P. "ran over, and squeezed me, and hugged me. She said, I love you Grandma. I miss you so much."

Jackson (D.P.'s counselor), Conaty (D.P.'s CASA advocate), and Laroe (AAL/GAL), on the other hand, testified that D.P. likes living with Aunt and does not want to return to Grandmother.

We conclude that this factor is neutral.

### B.  D.P.'s current and future emotional and physical needs, and emotional and physical danger to D.P. now and in the future

The evidence offered at trial regarding the second and third *Holley* factors focused primarily on D.P.'s emotional needs.[6] The court heard extensive testimony about emotional danger to D.P. if the court granted Grandmother access or possession. This testimony was based on Grandmother's conduct after D.P. was removed from her home and the negative effect of that conduct on D.P.

The Department's caseworker Brown testified that the court had stopped D.P.'s visits with Grandmother because Grandmother was "really inappropriate in her interactions with the child," including asking D.P. to send her recordings of the foster parent's home and instructing D.P. to ask the foster parent "grownup questions" such as how much money the foster parent made. Grandmother also was critical of D.P.'s hair and clothing. Brown testified to her understanding that D.P. "did have some outbursts after those visits" with Grandmother.

Aunt also testified that visits with Grandmother were upsetting to D.P. After visits with Grandmother, Aunt described D.P. as "angry, anxious, conflicted, and mistrusting," even when the visits had been supervised by the Department.

---

[6] The limited evidence offered at trial on the issue of D.P.'s physical needs supported a conclusion that both Grandmother and Aunt could meet those needs. For example, Brown (the Department caseworker) testified that she had no concerns about the condition of Grandmother's home and that Grandmother "was caring for the child properly" before D.P.'s removal. Similarly, Brown testified that D.P. "is thriving in the home with [Aunt]." Consequently, we conclude this factor is neutral.

On questioning by Laroe, the AAL/GAL, Aunt testified that she discovered Grandmother had given D.P. a phone to communicate with Grandmother and to send Grandmother pictures of her foster home and family. Grandmother was calling D.P. to talk without supervision, contrary to the court's order. Aunt also testified that Grandmother used D.P. to obtain information about Aunt, including her address and how much money she made. The phone had location services on it so that Grandmother would know where D.P. was at any time. Aunt testified that D.P.'s therapist recommended that the phone be returned to Grandmother.

Jackson, D.P.'s therapist, testified that she had been seeing D.P. for thirty minutes to an hour every week since April 2021. Jackson explained that she recommended return of the phone because "it appeared that [D.P.] was struggling emotionally, week-to-week with trying to—with the confliction of who do I please? Do I do what I know is right, or that I'm learning is right, or do I continue to do what my grandmother says because I fear that she's going to be angry?" Jackson testified that after one visit with Grandmother, D.P. had "a crisis," and Aunt called Jackson for help. Jackson testified that D.P. "was having an emotional breakdown," was "aggressive verbally," and was demanding that Aunt "give her the information, how much she made, what's your address, what do you do." D.P. "was in tears, saying I got to get this information. My grandma said I got to have this information before next visit." Jackson testified that Grandmother was putting emotional pressure on

D.P., undermining her relationships with her caregivers, and emotionally manipulating D.P., resulting in emotional abuse.

Jackson also testified that once the visits and telephone contact with Grandmother were discontinued, D.P. "was calm. She was very cooperative." Jackson explained:

Q. So did it look like the anxiety was gone, and all the barriers for her to love, and trust [Aunt] were now able to be instituted for her?

A. I believe that it provided her, what we consider a safe place, to develop, and be a kid, to relinquish, release, the need to try to please somebody, and to remove the cover of whether I make a good choice, or a bad choice.

Jackson concluded that although D.P.'s behavioral outbursts did not entirely cease, D.P. "learned coping. She learned how to start processing her cognitive skills. And when she would make a mistake, she could verbalize what her corrective action should be."

Similarly, Aunt testified that after the court discontinued visits with Grandmother, D.P. was like "another child." She "wasn't as combative. She stopped the talking back. There were no more adult-like, or grown people questions. Like, she was just—she calmed down a lot. Her mind was, you know, at ease. She settled into things, you know, she was open to learning new stuff. Like, she wasn't so resistant to everything. She was not angry." D.P.'s anxiety, inappropriate questions, and tantrums "all went away" when the visits with Grandmother stopped.

Jackson testified that emotional manipulation by a parent or loved one can lead to "devastating consequences" to a child such as low self-esteem, anger, resentment, shame, and "maladaptive patterns that can continue into adult life." Jackson agreed that D.P. had "every one of these devastating consequences" when she "was having even supervised visitation with her grandmother."

In response to the Department's contention that visits with Grandmother negatively affected D.P.'s behavior, Father relies on CASA advocate Conaty's testimony that she did not observe changes in D.P.'s behavior after visits with Grandmother stopped. Brown's contrary observation, Father points out, was not "direct eyewitness testimony, but her knowledge from the 'case report.'" But as we have discussed, Jackson and Aunt testified from their firsthand observation to positive changes in D.P.'s behavior after visits with Grandmother ceased. The trial court was the sole judge of the witnesses' credibility. *In re A.B.*, 437 S.W.3d at 503.

Father argues further that only one of D.P.'s three caseworkers made an attempt to discuss Grandmother's behavior with her. Father also cites Conaty's testimony that Grandmother's complaints after visits arose from Grandmother's desire for D.P. "to be wearing nicer shoes, better clothes, and have her hair done differently," that is, wanting the best care for D.P., however expressed. These arguments, however, focus on Grandmother, rather than on D.P., contrary to the requirement that courts' "primary consideration" must be D.P.'s best interest. *See* TEX. FAM. CODE § 153.002; *see also In Interest of E.L.*, No. 09-15-00306-CV, 2016

WL 348963, at *7 (Tex. App.—Beaumont Jan. 28, 2016, pet. denied) (mem. op.) ("In evaluating the best interest of the children, we focus, necessarily, on the children, not the parents.").

Father also relies on Conaty's testimony that until Grandmother's positive drug test, Conaty did not "have any issue with the care that [D.P.] was receiving" from Grandmother. Father cites one of Conaty's reports as recommending "improving" D.P.'s visits with Grandmother rather than stopping them. That report, however, noted a therapist's opinion that D.P.'s "attitude and inappropriate questions are being influenced by her Grandmother" and Grandmother's criticisms, and Grandmother's visits should be "more positive and focus on the fact that [D.P.] is healthy, safe, and in a loving home."

We also note Jackson's testimony about D.P.'s progress at school. Jackson testified that when counseling began, D.P. was in foster care. Jackson explained that at that time, D.P. was "severely impaired" educationally. She was being considered for special education and "behavioral units." She was "exhibiting impaired focus levels" and was "aggressive" with both her teachers and her peers. In sum, D.P. "was pretty much almost not functioning in the school environment."

Jackson testified that D.P. has now made "tremendous progress" on all of these problems. She is "now functional in the educational environment" and is "very well adapted to her educational plan." She is no longer disruptive in the classroom.

She is no longer being considered for special education or behavioral units. She is learning and thriving.

We conclude that the factors of D.P.'s current and future emotional needs and current and future emotional danger weigh heavily in favor of the trial court's ruling.

### C. Programs available to assist these individuals to promote the best interest of the child, and plans for the child by those seeking custody

Aunt is participating in the Fostering Connections Program in order to become D.P.'s managing conservator. Brown testified that Aunt had completed all but one of the program's requirements at the time of trial, Aunt's participation in the program was going well, and she expected Aunt to be successful in completing the program. Aunt has also participated in family counseling sessions with Jackson. Aunt testified that she believes D.P.'s weekly therapy sessions are beneficial and would like them to continue.

Jackson recommended that to facilitate any future relationship between D.P. and Grandmother, "it would be very advantageous for" Grandmother to consider parenting and "healthy family systems" classes, as well as individual counseling. If Grandmother did so, Jackson would consider Grandmother's participation in her counseling sessions with D.P. But Jackson testified unequivocally that granting Grandmother custodial rights "at this time"—even supervised or by phone—is not in D.P.'s best interest and would significantly impair D.P.'s emotional well-being.

Grandmother and Father did not testify about available programs or specific plans they had for D.P. if D.P. was placed with Grandmother. Grandmother testified she is working "two and a half" jobs and sometimes three, and had worked hard to provide for D.P. while D.P. was in her care.

We conclude that this factor weighs in favor of the trial court's decision.

### D. Stability of the home or proposed placement and parental abilities of the individuals seeking custody

The court heard testimony that since her placement with Aunt, D.P. was more successful at school, taking leadership roles, improving her grades, and no longer needing a behavioral plan. She has a friend group in Aunt's neighborhood, and has met members of Mother's family for the first time, including her grandfather. At the time of trial, Aunt was teaching D.P. how to tie her shoes. They read books together, and Aunt is teaching D.P. to pray. Aunt asks D.P. about things D.P. has learned at school, and they watch television together. Aunt testified that D.P. "gets all of my undivided attention." She described D.P. as "a sweet and affectionate child," and testified that she is "willing to provide and care for [D.P.] long term."

Aunt testified that she is "very open to" supervising D.P.'s visits with both Father and Mother and looks forward to D.P. "building a relationship" with both parents. Aunt clearly stated, however, that she was unwilling to supervise visits with Grandmother because visits in the past had been so upsetting to D.P. Father contends the trial court's order "effectively end[s]" D.P.'s relationship with Grandmother, and puts D.P. "at risk of being cut off from her paternal family." He argues that D.P. has

a relationship with Grandmother and has lived with her most of her life, and it is not in D.P.'s best interest to deny Grandmother access. He complains that Aunt "has no desire to know [Grandmother] or maintain the child's relationship with [Grandmother]."

At the conclusion of the hearing, the trial court stated, "I'm a little surprised that [Aunt] takes the position, that if [Grandmother] gets visitation, or access, then she will no longer want to be the conservator, to take care of that child." The court continued,

> That's a position I'm really surprised to hear, but I'm also looking at things from [Aunt's] perspective, and the way she testified about how the changes affected the child when she was in contact with [Grandmother], and the regression, and the remedial works that she had to do, apparently, to stabilize, and get the child back right.

The trial court also cited Jackson's "unequivocal" testimony that granting Grandmother custodial rights would not be in D.P.'s best interest. The court recognized that Grandmother "loves this child," worked hard to provide nice clothes for D.P., and had understandable disappointment if D.P. came to visits looking unkempt. But the court emphasized "how well the child has done" with Aunt, and how Aunt "just has, apparently, stepped up, and taken on this huge responsibility. At a time when, apparently, there was nobody else available."

We conclude that this factor weighs in favor of the trial court's decision.

**E.** **Acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for those acts or omissions**

Regarding Grandmother's alleged drug use, Father argues that no drug test was introduced into evidence and Grandmother's testimony "supports that any potential drug tests were inaccurate and unreliable." Grandmother unequivocally denies any drug use. Father also contends there was "no direct evidence presented regarding any additional CPS case [Grandmother] may or may not currently be involved in" and no documentary evidence supporting Brown's testimony that another child had been removed from Grandmother's care.

Although no exhibits showing drug test results were offered or admitted into evidence, several witnesses testified that Grandmother's hair strand tests were consistently positive for cocaine at the time of D.P.'s removal from her care and after. Further, Brown testified without objection that a home study for Grandmother was denied because of Grandmother's past cocaine use, a charge of neglectful supervision of another child, and two unrelated criminal charges, for one of which, felony theft, Grandmother was still on probation. The trial court was the sole judge of the credibility of this evidence, *In re A.B.*, 437 S.W.3d at 503, and we conclude that this factor weighs in favor of the trial court's decision.

**F. Conclusion**

Our analysis of the evidence guided by the *Holley* factors supports our conclusion that the trial court did not abuse its discretion in its rulings (1) appointing

the Department as managing conservator with plans to transfer managing conservatorship to Aunt under the conditions stated in the trial court's order, and (2) not granting any access or possession to Grandmother. *See Moroch*, 174 S.W.3d at 857; *In re A.B.P.*, 291 S.W.3d at 95 (discussing standards of review).

**3. Grandmother's possession and access**

Although Grandmother's appeal has been dismissed, Father has expressly requested in his appeal that we "reverse the trial court's order denying [Grandmother's] possession and access to the child." In response, the Department argues there are additional grounds under the family code supporting a conclusion that the trial court did not abuse its discretion in denying Grandmother's access to D.P. The Department contends Grandmother did not meet the requirements of family code section 153.433 for possession of or access to a grandchild. TEX. FAM. CODE § 153.433.

The record reflects that D.P. was removed from Grandmother's care in November 2020 after Grandmother's hair strand test was positive for the presence of drugs. Grandmother then had supervised visits with D.P. until the trial court ruled on June 29, 2021, that "Grandmother's access to the child is suspended."

On August 31, 2021, Grandmother filed a "Petition in Intervention for Grandparent Possession or Access." The Department, the AAL/GAL, and Father all filed motions to strike the intervention. Finding that Grandmother "has standing

under [Family Code section] 102.004(b),"[7] however, an associate judge denied the motions to strike Grandmother's intervention, and Grandmother remained a party to the proceedings.

In her petition, Grandmother sought "sole managing conservatorship and possession of or access to" the child. Family code section 153.433 governs a grandparent's possession of or access to a grandchild. TEX. FAM. CODE § 153.433. The court "may order reasonable possession of or access to a grandchild by a grandparent if" three conditions are met:

> (1) at the time the relief is requested, at least one biological or adoptive parent of the child has not had that parent's parental rights terminated;
>
> (2) the grandparent requesting possession of or access to the child overcomes the presumption that a parent acts in the best interest of the parent's child by proving by a preponderance of the evidence that denial of possession of or access to the child would significantly impair the child's physical health or emotional well-being; and
>
> (3) the grandparent requesting possession of or access to the child is a parent of a parent of the child and that parent of the child:
>
> > (A) has been incarcerated in jail or prison during the three-month period preceding the filing of the petition;
> >
> > (B) has been found by a court to be incompetent;

---

[7] This section provides, in relevant part, that the court may grant a grandparent who is "deemed by the court to have had substantial past contact with the child" leave to intervene in a pending suit "if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development." TEX. FAM. CODE § 102.004(b). Subsection (c) of section 102.004 provides that "[p]ossession or access to a child by a grandparent is governed by the standards established in Chapter 153."

     (C)  is dead; or

     (D)  does not have actual or court-ordered possession of or access to the child.

TEX. FAM. CODE § 153.433(a)(1)–(3); *see also In re B.N.S.*, 247 S.W.3d 807, 808 (Tex. App.—Dallas 2008, no pet.) (discussing family code § 153.433). While Father's parental rights have not been terminated and he supported Grandmother's request, he is not incarcerated, incompetent, or deceased, and the court appointed him as a possessory conservator of D.P. Consequently, Grandmother has not met section 153.433's conditions for possession or access to D.P. *See also In re B.N.S.*, 247 S.W.3d at 809 (where mother had court-ordered possession of the children, mother's parents did not meet section 153.433's requirements). For this additional reason, the trial court did not abuse its discretion in its rulings regarding Grandmother.

We decide Father's issue against him.

## CONCLUSION

The trial court's January 20, 2022 "Order in Suit Affecting the Parent-Child Relationship" is affirmed.

220147f.p05

/Leslie Osborne//
_____
LESLIE OSBORNE
JUSTICE

–21–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF D.P., A
CHILD,

No. 05-22-00147-CV

On Appeal from the 256th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DF-17-14694.
Opinion delivered by Justice
Osborne. Justices Myers and Nowell
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 19th day of July, 2022.